UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| **GEICO Indemnity Company,** | )<br>) |
| Plaintiff, | )  3:12-cv-08127 JWS |
| vs. | )  ORDER AND OPINION |
| **Darinda Kay Smith,** *et al.*, | )  [Re: Motions at Dockets 79 and 85] |
| **Defendants.** | ) |
| **Hillary Rider,** *et al.*, | ) |
| Counterclaimants | ) |
| vs. | ) |
| **GEICO Indemnity Company,** | ) |
| Counterdefendant | ) |

### I.  MOTIONS PRESENTED

At docket 79 plaintiff and counterdefendant GEICO Indemnity Company ("GEICO") moves for partial summary judgment pursuant to Rule 56, supported by a separate statement of facts at docket 80.  Defendants Darinda Kay Smith, Barry T. Webb, Hillary Rider, Amber Davis, and Nathan Davis (collectively, "Defendants") oppose at docket 83, supported at docket 84 by a separate statement of facts and response to GEICO's separate statement of facts.  GEICO replies at docket 91,

supported by a supplemental statement of facts and objections to Defendants' separate statement of facts.[1]

At docket 85 counterclaimants Hillary Rider and Barry T. Webb (collectively, "Rider") move for partial summary judgment pursuant to Rule 56, supported by a separate statement of facts at docket 86. GEICO opposes at docket 93, supported by a controverting statement of facts and separate statement of facts at docket 94. Rider replies at docket 98, supported by a response to GEICO's separate statement of facts at docket 99.[2]

Oral argument was heard on October 3, 2016.

## II.  BACKGROUND

This case arises from the tragic December 6, 2010 automobile collision between Darinda Kay Smith ("Smith") and Garret Rider-Webb. Mr. Rider-Webb was killed in the collision, and Smith suffered a traumatic brain injury that rendered her incapable of remembering the accident or anything that happened before 2010.[3]

Smith was driving a Cadillac Escalade that was formerly owned by her daughter Amber Davis ("Davis") and Davis' then-husband Nathan Davis. The parties agree that

---

[1]This filing is not allowed under the Local Rules. "The Local Rules do not permit a party moving for summary judgment to file a separate statement of facts in response to the non-moving party's statement of facts." *GoDaddy.com, LLC v. RPost Commc'ns Ltd.*, No. CV-14-00126-PHX-JAT, 2016 WL 3068638, at *1 (D. Ariz. June 1, 2016). Further, the moving party's objections to the non-moving party's statement of facts must be made in the reply memorandum itself, not in a separate filing. LRCiv 7.2(m)(2). Because Defendants do not object, however, the court will treat this filing as an unopposed motion for leave to file a supplemental statement of facts and objection to Defendants' separate statement of facts. This constructive motion is granted.

[2]This filing is not allowed under the Local Rules. "The Local Rules do not contemplate . . . filing a separate response to the non-moving party's statement of facts." *Kinnally v. Rogers Corp.*, No. CV-06-2704-PHX-JAT, 2008 WL 5272870, at *2 (D. Ariz. Dec. 12, 2008). Because GEICO does not object, however, the court will treat this filing as an unopposed motion for leave to file a response to GEICO's separate statement of facts. This constructive motion is granted.

[3]Doc. 80 at 2 ¶ 2.

Smith acquired ownership of the Escalade before the accident, but the date of the acquisition is disputed. The Escalade was still listed on the Davises' Farmers Insurance Company ("Farmers") automobile policy, and Smith was listed as an insured driver.

At the time of the accident Smith was also covered by an automobile insurance policy written by GEICO. The only vehicle listed in the GEICO policy is a 2006 Chevrolet Silverado 1500, and Smith's son Brandon is listed as an additional driver.[4] The policy has a $20,000 per person bodily injury liability limit. Smith submitted to GEICO a claim for coverage in January 2011.[5] GECIO denied Smith's claim because the Escalade was "available and furnished for the regular use of [Smith] and it was not listed on the policy."[6]

Barry T. Webb and Hillary Rider are the deceased's parents. In September 2011 Rider made a settlement offer to both GEICO and Farmers, stating that she would settle all claims against Smith for the limits of both policies, provided that Smith confirmed that she lacked other insurance or "appreciable assets."[7] Farmers agreed to pay the policy limits,[8] but GEICO rejected Rider's offer, stating that the loss was not covered under Smith's policy.[9]

In December 2011 Rider sued Smith and the Davises for wrongful death and negligent entrustment.[10] In a letter dated May 3, 2012, Smith made a policy limits

---

[4]Doc. 1-2 at 2.

[5]Doc. 80-1 at 98–100.

[6]Doc. 1-4 at 3.

[7]Doc. 1-5 at 2–3.

[8]Doc. 1-6 at 2.

[9]Doc. 1-7 at 2.

[10]Doc. 1-8.

demand to GEICO.[11] She provided GEICO with a draft "*Damron* agreement"[12] between Smith, the Davises, and Rider under which Smith and the Davises would (1) stipulate to a $2 million judgment in Rider's favor; (2) assign any claims they had against GEICO to Rider; and (3) receive a covenant that Rider would not execute the judgment against them.[13] Smith informed GEICO that if GEICO did not pay the policy limit "to fully protect" Smith, then Smith, the Davises, and Rider would sign the agreement.[14] This demand obviously implies that if GEICO *did* pay the policy limit, Rider would dismiss her case against Smith and the Davises. Rider's counsel states that Rider never authorized Smith to make this settlement offer on her behalf.[15]

On Smith's deadline GEICO informed Rider that it would pay her the policy limits.[16] It is unclear whether Rider ever responded to GEICO herself, but on May 18 Smith's counsel informed GEICO that Rider would not accept GEICO's policy limits offer and instead would seek the full amount of any judgment.[17]

In June 2012 GEICO filed the instant action for a declaratory judgment that coverage does not exist.[18] In August, Smith, the Davises, and Rider executed the

---

[11]Doc. 1-9.

[12]A *Damron* agreement is a settlement agreement entered in response to an insurer's refusal to defend the insured whereby the insured admits to liability and assigns to the plaintiff his or her rights against the insurer in exchange for the plaintiff's promise not to execute the judgment against the insured. *See Safeway Ins. Co. v. Guerrero*, 106 P.3d 1020, 1022 n.1 (Ariz. 2005) (citing *Damron v. Sledge*, 460 P.2d 997 (Ariz. 1969)).

[13]Doc. 1-9 at 4–9.

[14]*Id.* at 2.

[15]Doc. 98 at 4.

[16]Doc. 1-10 at 3.

[17]Doc. 1-11 at 2.

[18]Doc. 1.

*Damron* agreement.[19] Rider then filed her counterclaim against GEICO, alleging that GEICO breached the insurance contract and the covenant of good faith and fair dealing.[20]

GEICO's motion at docket 79 seeks summary judgment on its declaratory relief claim and on Rider's breach-of-contract claim.[21] Rider's motion at docket 85 seeks partial summary judgment on her claim that GEICO is liable for the excess judgment.[22]

### III. STANDARD OF REVIEW

Rule 56(a) authorizes motions for partial summary judgment upon any part of a claim or defense. Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[23] The materiality requirement ensures that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[24] Ultimately, "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the nonmoving party."[25] However, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[26]

---

[19] Doc. 80-1 at 22–27.

[20] Doc. 12.

[21] Doc. 79 at 11.

[22] Doc. 85; doc. 98.

[23] Fed. R. Civ. P. 56(a).

[24] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[25] *Id.*

[26] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party has the burden of showing that there is no genuine dispute as to any material fact.[27] Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, the moving party need not present evidence to show that summary judgment is warranted; it need only point out the lack of any genuine dispute as to material fact.[28] Once the moving party has met this burden, the nonmoving party must set forth evidence of specific facts showing the existence of a genuine issue for trial.[29] All evidence presented by the non-movant must be believed for purposes of summary judgment and all justifiable inferences must be drawn in favor of the non-movant.[30] However, the non-moving party may not rest upon mere allegations or denials, but must show that there is sufficient evidence supporting the claimed factual dispute to require a fact-finder to resolve the parties' differing versions of the truth at trial.[31]

## IV. DISCUSSION

**A.     Whether the Escalade Was Covered Under GEICO's Policy**

GEICO seeks partial summary judgment that it did not breach the insurance contract by denying Smith's claim. It contends that Defendants cannot meet their burden of proving that the Escalade was covered.[32] Defendants respond by arguing that the Escalade was covered under either the newly-acquired or replacement-vehicle clauses of the policy.

---

[27]*Id.* at 323.

[28]*Id.* at 323–25.

[29]*Anderson,* 477 U.S. at 248–49.

[30]*Id.* at 255.

[31]*Id.* at 248–49.

[32]*See Keggi v. Northbrook Prop. & Cas. Ins. Co.*, 13 P.3d 785, 788 (Ariz. Ct. App. 2000) ("Generally, the insured bears the burden to establish coverage under an insuring clause, and the insurer bears the burden to establish the applicability of any exclusion.").

### 1. The newly-acquired-vehicle clause

Smith's policy provides that a newly-acquired vehicle is covered if the insured acquires ownership of it during the policy period, GEICO insures all other vehicles owned by the insured, and the insured asks GEICO to add the new vehicle to the policy within 30 days of acquisition.[33] GEICO argues that Defendants cannot establish that this clause applies because they cannot show that Smith acquired the Escalade on or after November 6, 2010—*i.e.*, 30 days before the collision. Defendants respond that the policy's reference to "acquiring ownership" is ambiguous and should be construed in their favor as meaning "obtaining title or some tangible evidence of ownership."[34] Under this interpretation, Smith acquired the Escalade on November 18, 2010—the day Nathan Davis signed the title over to Smith.[35]

Defendants' argument is inconsistent with Arizona law. In *Yahnke v. State Farm Fire & Cas. Co.*, the Arizona Court of Appeals considered a similar newly-acquired-vehicle clause.[36] The court held that, under the plain meaning of the policy and construing the policy against its issuer, the date of acquisition refers to the date on which the owner had "full use and dominion over the vehicle," meaning "complete ownership or a right to the property."[37] This date is not necessarily the date the insured obtained physical possession of the vehicle or the date title was transferred from the previous owner. To determine the date of acquisition, the court looks to the parties' intent.[38]

---

[33] Doc. 1-1 at 5.

[34] Doc. 83 at 4.

[35] Doc. 80-1 at 95.

[36] 419 P.2d 548, 551 (Ariz. Ct. App. 1966).

[37] *Id.* at 550.

[38] *Id.* ("The property was transferred from father to plaintiff when the parties intended it to be so transferred, 'and their intentions may be disclosed by their conduct, common usage, and

Davis testified that she gifted Smith ownership of the Escalade without any expectation of payment.[39] She also testified that once Smith took possession of the Escalade and drove it from Davis' home in Colorado to her home in Arizona, she had exclusive custody and control of it,[40] and Davis no longer retained any interest in the vehicle.[41] Because Smith had full use and dominion over the Escalade at delivery, the date of delivery controls. The date the pink slip was executed does not control because Davis delivered the pink slip to Smith merely to complete the change in ownership.[42]

Defendants point to the following evidence that tends to show that Smith took possession of the Escalade after November 6, 2010:

- Davis testified that Smith took possession of the Escalade "shortly before her accident." Davis could not remember the exact date but said she knew it "was sometime before Thanksgiving."[43]
- The signed pink slip, which is dated November 18.[44] Davis testified that, before Smith made any payments to Davis for the Escalade, Davis obtained the Escalade's title and mailed it to Smith.[45] She also testified that before the title was transferred to Smith the Escalade was in Colorado.[46]

---

the circumstances of the case.'") (quoting *Everly v. Creech*, 294 P.2d 109, 113 (Ca. Ct. App. 1956)).

[39] *See* doc. 80-1 at 10 pp. 27–28; *id.* at 11 p. 30:6–11; doc. 92-1 at 18 pp. 46–47.

[40] Doc. 80-1 at 15 pp. 71–72.

[41] *Id.* at 14 p. 53:2–5.

[42] *See Creech*, 294 P.2d at 114.

[43] Doc. 80-1 at 11 pp. 29:20–30:1.

[44] Doc. 84-6 at 2.

[45] Doc. 80-1 at 10 p. 27:12–19.

[46] *Id.* at 11 p. 30:2–5.

- Smith wrote Davis an undated check for $300 with what appears to be "Ins." written on the memo line, which Davis deposited into her bank account on November 17, 2010.[47] Smith did not write any checks to Davis in September or October, 2010.[48] Defendants argue that this suggests that the $300 check was one of the payments that Smith said she was going to make to Davis once she received the Escalade.[49]

- Davis testified that Smith and her son Brandon were supposed to have had an arrangement whereby Brandon would own the Silverado once Smith took possession of the Escalade.[50] Smith wrote checks to pay down her loan on the Silverado that are dated January 5, February 8, February 28, April 9, August 10, and October 27, 2010.[51] These checks either list her account number or the word "truck" on the memo line. Her check dated November 30, 2010, however, arguably has "Brand. Truck" written on the memo line,[52] suggesting that at that time that Brandon had acquired ownership of the Silverado and Smith was in possession of the Escalade.

- Call logs from a cell phone that may have been Smith's show that no calls were made between 1:31 pm on November 28 and 7:03 am on November 29, 2010.[53] Davis states that Smith "regularly drove at night

---

[47]Doc. 84-7.

[48]Doc. 84 at 8 ¶ 23; doc. 92 at 7 ¶ 23.

[49]Doc. 80-1 at 36–37; doc. 92-1 at 18 pp. 46–47.

[50]Doc. 80-1 at 15:5–11.

[51]Doc. 84-4 at 1–6.

[52]Doc. 84-5.

[53]Doc. 84-9.

   when returning to Arizona from Colorado, usually leaving around 5 or 6 pm."[54]

- Smith's bank records show three transactions dated Tuesday, November 30, 2010: two occurred in Show Low, Arizona, but the other occurred in Greeley, Colorado.[55]

Defendants' evidence is sufficient to create a triable issue of material fact. The only party to the transaction with any memory of the events is Davis.[56] If the court draws the all justifiable inferences in Defendants' favor, Davis' testimony tends to show that the Escalade was in Colorado before the title was transferred to Smith, and the title document shows that title was transferred to Smith on or after November 18. This evidence is sufficient to allow a jury to reasonably conclude that it is more likely than not that delivery occurred on or after November 6. Questions of material fact preclude summary judgment in GEICO's favor.

  **2. The replacement-vehicle clause**

Smith's policy also covers an automobile acquired during the policy period that replaces the vehicle described in the policy.[57] Courts interpreting similar "replacement-vehicle" clauses have held that such vehicles are those that "replace the car described in the policy, which must be disposed of or be incapable of further service at the time of replacement."[58] "An owner acquiring a new car may decide that it will be used by another member of the family, that it will be used only for special purposes (such as long distance trips or camping), that it will immediately replace a presently owned car or

---

[54]Doc. 84-2 at 1 ¶ 2.

[55]Doc. 84-8.

[56]Smith and Nathan Davis both testified that they do not remember when Smith took possession of the Escalade. *See* doc. 80-1 at 19, 30.

[57]Doc. 1-1 at 5.

[58]*Allstate Ins. Co. v. Gov't Emp. Ins. Co.*, 202 S.E.2d 640, 642 (S.C. 1974).

. . . that it will eventually replace a presently owned car."[59] To determine whether the new vehicle is a replacement, courts look to the owner's intent.[60]

GEICO argues that Defendants lack evidence that Smith intended to replace her Silverado with the Escalade. In response, Defendants point to the following evidence:

- Davis' testimony that after Smith obtained the Escalade she was supposed to have transferred ownership of the Silverado to her son Brandon.[61]
- Smith's loan payment check for the Silverado dated November 30, 2010, which appears to have "Brand. Truck" written on the memo line.[62]

This evidence is sufficient to permit a jury to reasonably conclude that Smith replaced her Silverado with the Escalade and disposed of the Silverado by transferring it to her son. Questions of material fact preclude summary judgment in GEICO's favor.

**B.    Whether GEICO May Be Liable for the Excess Judgment**

Rider's cross-motion seeks partial summary judgment on her claim that GEICO may be found liable for the full amount of Smith's damages, not just the $20,000 policy limit, because GEICO rejected a reasonable settlement offer. Implied in every insurance contract is a covenant of good faith and fair dealing that imposes on the insurer a duty to, among other things, give equal consideration to its insured's interests and to settle within policy limits where appropriate.[63] In deciding whether to accept a settlement offer the insurer must consider the insured's exposure to liability in excess of

---

[59]*Gov't Emp. Ins. Co. v. Reilly*, 441 A.2d 1139, 1141 (Md. Ct. Spec. App. 1982).

[60]*Id.*

[61]Doc. 80-1 at 15:5–11 (Davis testified that under this supposed arrangement Brandon would consider the Silverado "his.").

[62]Doc. 84-5.

[63]*State Farm Auto. Ins. Co. v. Civil Serv. Emp. Ins. Co.*, 509 P.2d 725, 732 (Ariz. Ct. App. 1973).

-11-

policy limits. An insurer that refuses to properly consider a reasonable settlement offer within the policy limits "will be liable to its insured for any judgment subsequently entered against the insured in excess of policy limits, [u]nless the insurer shows that an application of the equality-of-consideration test would not have required acceptance of the settlement offer."[64] This is because the insurer's choice to reject the settlement offer was a proximate cause of the excess judgment.[65]

It is undisputed that GEICO rejected Rider's September 2011 offer to settle her claims within the policy limit. Thus, at first blush, it would appear that GEICO is exposed to excess judgment liability. In *Acosta v. Phoenix Indem. Ins. Co.*, the injured plaintiff's attorney made an offer to settle for the policy limit that the insurer rejected before the tortfeasor filed a bankruptcy petition.[66] After the bankruptcy discharge, the insurer conceded coverage and offered to pay the policy limit, but this time the plaintiff refused to settle.[67] The Arizona Court of Appeals held that the insurer was exposed to potential liability for the excess judgment based on its rejection of the pre-bankruptcy settlement offer without regard to the fact that the insurer later reversed course and attempted to settle.[68]

GEICO raises two arguments for why it cannot be held liable for the excess judgment: (1) it reached a settlement agreement with Rider in 2012; and (2) equitable estoppel.

**1.    The 2012 settlement offer**

GEICO argues that it cannot be held liable for the excess judgment because it agreed to Smith's May 2012 settlement offer. In that correspondence Smith's lawyer

---

[64] *Id.* at 733–34 .

[65] *Rogan v. Auto-Owners Ins. Co.*, 832 P.2d 212, 217 (Ariz. Ct. App. 1991).

[66] 153 P.3d 401, 404 (Ariz. Ct. App. 2007).

[67] *Id.* at 402–03.

[68] *Id.* at 405.

informed GEICO that Smith and Rider had negotiated a *Damron* agreement. The draft *Damron* agreement attached to Smith's settlement offer, which Smith's counsel represented that Rider was willing to sign, states that Smith gave GEICO "the opportunity to reconsider its refusal to indemnify."[69] The draft is silent regarding the amount GEICO would have to pay in order to indemnify Smith. The actual $20,000 policy limit demand is found in the cover letter written by Smith's lawyer.

GEICO argues that Smith's $20,000 offer was "essentially a settlement offer from Rider too" for two reasons: (1) Rider was aware of the policy limits demand and (2) Rider "sanctioned it by agreeing to the offer as part of the *Damron* agreement she had negotiated with Smith and Davis."[70] Rider responds by arguing that GEICO's acceptance of Smith's settlement offer is irrelevant because Rider never authorized it and it was not made on Rider's behalf. According to Rider, Smith's attorney was supposed to demand full indemnification but mistakenly requested only the policy limit.[71] Rider also argues that Smith's attorney lacked authority to make a settlement offer on Rider's behalf.

Under the only reasonable interpretation of the letter, Smith was informing GEICO that she would receive full protection from personal liability in one of two ways: (1) if GEICO refused to pay the policy limit, Smith and Rider would execute the *Damron* agreement; or (2) if GEICO paid the policy limit, Smith would be fully protected because Rider would dismiss her action against Smith.[72] GEICO reasonably interpreted this

---

[69]Doc. 1-9 at 4 ¶ 11.

[70]Doc. 93 at 2.

[71]Doc. 98 at 2.

[72]Doc. 1-9 at 2.

letter as a settlement offer from Smith and Rider that it accepted. If the offer is binding on Rider, it would extinguish her counterclaims as a matter of contract law.[73]

GEICO raises four arguments for why Rider should be bound by Smith's offer. First, GEICO argues that Smith's lawyer acted with Rider's actual authority and Rider reneged on her promise to settle for the policy limit. Rider vehemently denies this. The court cannot resolve the parties' dispute at summary judgment because the question whether an actual agency existed is one of disputed fact.[74]

Second, at oral argument GEICO argued that Rider is bound to Smith's offer because Smith's lawyer was acting with apparent authority. To determine whether apparent authority applies the trier of fact must determine whether (1) GEICO reasonably believed that Smith's lawyer had Rider's permission to make the offer and (2) if so, whether such belief is traceable to something Rider said or did.[75] The court cannot rule in GEICO's favor on this argument, both because it was raised for the first time at oral argument[76] and because it presents disputed questions of material fact.[77]

---

[73] *See, e.g, Perry v. Ronan*, 234 P.3d 617, 621 (Ariz. Ct. App. 2010) (binding settlement agreement created by offer and acceptance).

[74] *See Phoenix W. Holding Corp. v. Gleeson*, 500 P.2d 320, 325–26 (Ariz. 1972) (actual authority fact question determined by looking at either express contract or circumstances as a whole); *Ruesga v. Kindred Nursing Centers*, L.L.C., 161 P.3d 1253, 1259 (Ariz. Ct. App. 2007).

[75] *O. S. Stapley Co. v. Logan*, 431 P.2d 910, 914 (Ariz. Ct. App. 1967); RESTATEMENT (THIRD) OF AGENCY § 2.03 (2006).

[76] *See Johnson v. Gruma Corp.*, 614 F.3d 1062, 1069 (9th Cir. 2010) (courts need not consider arguments raised for first time at oral argument).

[77] *See* RESTATEMENT (THIRD) OF AGENCY § 2.03 cmt. d (2006) ("It is usually a question for the trier of fact whether a reasonable person in the position of a third party would believe that an agent had the authority or the right to do a particular act. It is a separate but related question of fact whether such a belief is traceable to a manifestation of the principal.").

Third, GEICO argues that Rider should be estopped from maintaining "'a position inconsistent with one in which [s]he has acquiesced.'"[78] To invoke estoppel to prevent Rider from denying the existence of an agency relationship with Smith's lawyer, GEICO must show that it was "justifiably induced to make a detrimental change in position" because it believed that Smith's lawyer's settlement offer was made on Rider's account and Rider either (1) "intentionally or carelessly caused such belief;" or (2) had "notice of such belief and that it might induce" GEICO to change its position, and "did not take reasonable steps to notify [GEICO] of the facts."[79] "'Detrimental change of position' means an expenditure of money or labor, an incurrence of a loss, or subjection to legal liability, not the loss of the benefit of a bargain."[80] Here, the only detriment that GEICO identifies is the fact that Rider is now seeking "to use GEICO's willingness to compromise against the insurer by arguing that GEICO 'conceded coverage.'"[81] This argument misses the mark because GEICO never conceded coverage and, as discussed below, GEICO is not subject to legal liability based on its decision to tender the policy limit. GEICO has not established that it suffered a detriment from accepting the policy limit offer. Estoppel does not apply.

Fourth, GEICO argues that Rider is bound by Smith's offer because, as Smith's assignee, she stands in Smith's shoes and is subject to any defenses GEICO has against Smith. This argument lacks merit because, even if Rider stands in Smith's

---

[78] *Ivancovich v. Meier*, 595 P.2d 24, 28 (Ariz. 1979) (quoting *Graham v. Asbury*, 540 P.2d 656, 658 (Ariz. 1975)).

[79] RESTATEMENT (THIRD) OF AGENCY § 2.05 (2006). *See also Phoenix W. Holding Corp.*, 500 P.2d at 328 (to establish agency by estoppel, "the acts creating the estoppel must be done by the principal with knowledge or a reasonable ground for believing that the other party will rely thereon and change his position for the worse.").

[80] RESTATEMENT (THIRD) OF AGENCY § 2.05 cmt. b (2006). *See also Graham*, 540 P.2d at 658 (holding that to generally invoke estoppel "a person must have reasonably relied to his detriment on the acts, promises or representations of the adverse party.").

[81] Doc. 93 at 7.

shoes, Smith's claim that GEICO is liable for the excess judgment depends on GEICO's refusal of a settlement offer from Rider, not Smith.

### 2. Equitable estoppel

GEICO asserts that it made its "no-coverage determination," and therefore rejected Rider's initial settlement offer, in reasonable reliance on a telephone conversation with Davis in 2011 in which Davis stated that Smith acquired the Escalade in either September or October 2010 and failed to mention that Smith may have transferred her Silverado to her son.[82] GEICO argues that Davis (and by extension, Rider) is equitably estopped from repudiating her conduct in 2011. "The three elements of equitable estoppel are generally stated as follows: (1) affirmative acts inconsistent with a claim afterwards relied upon; (2) action by a party relying on such conduct; and (3) injury to the party resulting from a repudiation of such conduct."[83]

Because Davis has not repudiated her conduct during her 2011 telephone conversation with GEICO, GEICO's argument lacks merit. With regard to the date that Smith acquired the Escalade, Davis stated that she could not say exactly when, but she believed that in the "end of September, early October" 2010 she and her husband had told Smith that they had paid off the Escalade and were going to transfer it to her. "We had sent her, or given her the title, but she hadn't gotten insurance for it yet," Davis said. "But I honestly don't know, or remember an exact date or anything."[84] This statement is far too vague to support GEICO's estoppel argument. Because Davis did not definitively tell GEICO that Smith acquired the Escalade before November 6, she is not repudiating her February 2011 statements by now stating facts that are consistent with a post-November 6 acquisition date. Estoppel does not apply.

---

[82]Doc. 93 at 4–5.

[83]*Tucson Elec. Power Co. v. Arizona Dep't of Revenue*, 851 P.2d 132, 141 (Ariz. Ct. App. 1992).

[84]Doc. 80-1 at 36.

Davis' failure to mention that Smith may have transferred her Silverado to Brandon Smith is also insufficient to support estoppel. During the February 2011 telephone conversation GEICO did not ask Davis any questions about the Silverado. Davis' failure to volunteer information about the vehicle is not inconsistent with her later testimony that Brandon was supposed to acquire ownership of it.

### C. GEICO Is Not Liable for the Excess Judgment as a Matter of Law

In *Acosta*, the insurer initially rejected a policy limit offer but later conceded coverage and attempted to settle for the policy limit. The injured plaintiff attempted to use the insurer's eventual concession of coverage to establish that its initial rejection of the policy limit offer amounted to bad faith.[85] The Arizona Court of Appeals held that the insurer would be able to raise an equitable estoppel defense to this argument if it rejected the initial offer in reasonable reliance on its insured's factual statements, and later conceded coverage in reliance on newly discovered, contradictory information. On the other hand, the insurer would not be able to raise such an equitable estoppel defense if the insurer "did not rely on new information or additional facts, but instead, simply changed its position for business or other considerations."[86]

Rider argues that, under *Acosta,* GEICO is liable for the excess judgment as a matter of law because it tendered the policy limit as a business decision.[87] This argument is based on a misreading of *Acosta*. *Acosta* does not hold that insurers that make settlement offers are liable for excess judgments as a matter of law. It holds that, if an insurer concedes coverage, it cannot raise an estoppel defense to prevent the concession from being used against it if the concession was not based on the discovery of new facts going to coverage. Because GEICO never conceded coverage, this holding does not apply here.

---

[85] 153 P.3d at 405.

[86] *Id.* at 406.

[87] Doc. 85 at 3.

-17-

**V.  CONCLUSION**

Based on the preceding discussion, the motions at dockets 79 and 85 are denied.

DATED this 4th day of October 2016.

/s/ JOHN W. SEDWICK
SENIOR JUDGE, UNITED STATES DISTRICT COURT